UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-20353-Civ-COOKE/TORRES

CARNIVAL CRUISE LINE,

  Plaintiff,

vs.

ZARCO STANKOVIC,

  Defendant.

_____/

**OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

  This is an action in which Plaintiff, Carnival Cruise Line ("Carnival"), seeks a declaratory judgment that a release it entered into with one of its crewmembers, Defendant Zarko Stankovic, is valid and binding. Stankovic, who believes he was a victim of medical malpractice for which Carnival is liable, has filed counterclaims asserting, *inter alia*, that the release is invalid because Carnival procured it through fraud.

  I have jurisdiction under 28 U.S.C. § 1333 because the release is a maritime contract executed between a seaman and a vessel owner.

  Pending are (1) Carnival's Motion for Summary Judgment (ECF No. 57), and (2) Stankovic's Motion for Partial Summary Judgment (ECF No. 73). For the reasons that follow, I deny the Motions.

## BACKGROUND

  Stankovic, a United States citizen of Macedonian decent (ECF No. 73-1 ¶ 1), worked as a headwaiter for Carnival from 2002 to 2006. (ECF No. 57-1 at 10-11). In early 2005, he noticed that his left testicle was larger than his right. (*Id.* at 12). He visited the ship's physician on the Carnival *Pride*, who referred him to a shore-side urologist at the AmeriMed Hospital ("AmeriMed") in Puerto Vallarta, Mexico. (*Id.*). The AmeriMed urologist diagnosed Stankovic with varicocele, an enlargement of the veins within the scrotum. (*Id.* at 13; ECF No. 57-2). The urologist at AmeriMed also discovered a ten-millimeter cyst in Stankovic's right epididymis, the sperm duct behind his right testicle. (ECF No. 57-2).

  Upon learning this news, Stankovic travelled to Macedonia to consult a urological

1

surgeon, Dr. Ljupco Levovski, who confirmed the varicocele diagnosis. (ECF No. 57-3). Dr. Levoski performed a laparoscopic ligation of the enlarged scrotal vein in Stankovic's left testicle, which repaired the varicocele. (ECF 57-1 at 10-11). Following a period of recovery, Stankovic returned to work on the *Pride*. (*Id.* at 10).

In December 2005, after returning to work, Stankovic discovered blood in his semen and felt a burning pain in his right testicle. (*Id.* at 17). The ship's physician again referred him to AmeriMed for urological treatment. (ECF. No. 57-4). The AmeriMed urologists suspected that Stankovic suffered from acute epididymitis, an inflammation of his right epididymis. (*Id.*). They initially treated him with antibiotics, but observed no change in the paratesticular mass. (*Id.*; ECF No. 57-1 at 20). The ineffectiveness of the antibiotics raised a concern that the mass in Stankovic's right testicle might be malignant. (ECF No. 57-4).

On December 24, 2005, Dr. Pedro Lopez Cueto Espinosa performed a surgical exploration on Stankovic, possibly to remove the paratesticular mass or, if there was a malignancy, the entire right testicle. (*Id.*). Dr. Espinosa explained the possible outcomes of the surgery to Stankovic, who gave his consent for the procedure. (*Id.*; ECF 57-1 1 at 21). Dr. Espinosa performed the exploration, and determined that Stankovic's right testicle required removal. (ECF 57-1 at 23).

AmeriMed sent Stankovic's testicle for biopsy. (ECF No. 57-5). The results led Stankovic's physicians to diagnose him with "[l]ymphoma of big cells, with plasmacytoid differentiation of right epididymis, high degree of malignancy. In the limited testis tissue and spermatic cord are free affection." (*Id.*). It was Stankovic's first cancer diagnosis. (*Id.*).

Stankovic re-boarded the *Pride* after his surgery, and on January 1, 2006, Carnival medically signed him off for further cancer treatment. (ECF No. 57-1 at 26). This time, he met with Dr. Anthony Giorgio at the Little Company of Mary San Pedro Hospital in San Pedro, California. (ECF No. 57-1 at 27; ECF No. 57-6 at 8). Dr. Giorgio is a licensed, board-certified physician specializing in oncology, hematology, and internal medicine. (ECF 57-6 at 7, 96-97). Dr. Giorgio discussed with Stankovic the test results from his prior treatment at AmeriMed Hospital in Mexico. (ECF 57-1 at 27). He told Stankovic that he had stage IV non-Hodgkin's lymphoma. (ECF No. 57-1 at 29; ECF No. 57-6 at 12). Given that diagnosis, Dr. Giorgio estimated that Stankovic's five-year survival rate was 60-70%. (ECF No. 57-6 at 19).

In late January 2006, Dr. Giorgio obtained a second pathology report on Stankovic's testicle. (ECF No. 57-7). The report supported Dr. Giorgio's cancer diagnosis, stating that

Stankovic suffered from "[d]iffuse B-cell lymphoma involving testis and epididymis." (*Id.*). Dr. Giorgio also microscopically reviewed Stankovic's biopsy material himself, observing that Stankovic's cells "showed to [him] that this was lymphoma." (ECF No. 57-6 at 10-11). He then performed "a CAT scan, which showed pulmonary nodules, and a PET scan, which showed a cancerous active lymph node in the right parotid region." (*Id.* at 12).

Dr. Giorgio submitted Stankovic's cancer diagnosis to the hospital's tumor board for review. (*Id.* at 11). The board includes surgeons, oncologists, and radiation therapists at the facility, and convenes to discuss all cancer cases at the hospital. (*Id.* at 63-64). After reviewing Stankovic's medical records, the board agreed with Dr. Giorgio's lymphoma diagnosis. (*Id.* at 11).

Dr. Giorgio's treatment plan for Stankovic was "six courses of combination chemotherapy, followed by external beam radiation therapy, followed by intrathecal chemotherapy – that's chemotherapy delivered into the spinal fluid – to prevent the lymphoma from growing in the central nervous system." (*Id.* at 12). Although Dr. Giorgio explained the treatment plan to Stankovic (ECF 57-1 at 33), Stankovic asserts that he does not remember specific conversations with Dr. Giorgio regarding his pathology reports or blood tests.[1] (*Id.* 31, 36).

On March 15, 2006, the pathologists at San Pedro Hospital sent Stankovic's biopsy material to South Miami Hospital for further pathology studies, a gene rearrangement analysis and immunohistochemcial analysis. (*Id.* at 72; ECF No. 57-8; ECF No. 57-9). South Miami Hospital pathologists consulted with pathologists at the University of Miami to conduct their analysis. (ECF No. 73-4). In short, the gene rearrangement study and immunohistochemical analysis "exploit the antigenticity of a tumor, the ability to make and label an antibody to that tumor cell and identify it under the microscope."[2] (ECF No. 57-6 at 123). Pathologists conducted the tests, and believed that the results "favor[ed] a chronic inflammatory process rather than a malignant lymphoma." (ECF No. 57-8). Carol Ceruzzi, Carnival's Crew Medical

---

[1] Stankovic testified, "[Dr. Giorgio and I] had many discussions . . . about my situation, but I'm not a doctor, so when somebody's explaining to me levels of white cells and red cells, I really don't know what's going on." (ECF No. 57-1 at 30).

[2] The gene study examines cells from the tumor and healthy cells in combination to determine whether there is "clonality" in the tumor. (ECF No. 57-6 at 16). The test does not examine individual cells to characterize a lymphoma. (*Id.*).

Coordinator at the time, received the new pathology report and forwarded it to Dr. Giorgio.[3] (ECF No. 57-10).

Dr. Giorgio reviewed the report, but did not change his diagnosis. (ECF 57-6 at 17-18). He explained his thinking at his deposition:

> [A] special, highly technical assessment of the mixture of cells obtained with his testicular biopsy did not discredit the diagnosis because so many different types of cells were examined. And since I have seen, as well as two other pathologists have seen, the individual cells which were clearly lymphoma cells, the gene rearrangement study did not exclude that diagnosis.

(*Id.* at 18).

Dr. Giorgio also testified, "[p]athologists don't always agree, but when being wrong is a death sentence, you are going to definitely err on the side of treatment. You don't want to be wrong. And if you are wrong, the outcome is indisputable. This is a lethal cancer. Without treatments, patients succumb routinely." (*Id.* at 124-25). He claims he was "absolutely positive" Stankovic had testicular lymphoma, even taking into account the South Miami Hospital/University of Miami pathology report. (*Id.* at 125).

Dr. Giorgio claims that he discussed the new report with Stankovic, and that Stankovic, after hearing the risk associated with leaving lymphoma untreated, decided to proceed with his treatment as prescribed. (*Id.* at 17-18, 21). Although not conclusive, an April 27, 2006 note Ceruzzi entered into Carnival's computer system may suggest that such a discussion took place:

> Summary/Update: [Crewmember "CM"] has been undergoing chemo round 5 just completed. Has required epigen injections in btwn. Had Muga scan - ejection 51%. Had re-read of bx @ smh re done at U of Miami - Neg however in discussing with Dr. Giorgio he felt CM should be treated because with 2 neg and 2 pos and the type of lymphoma they believe it to be better to treat than not. Also states CM had discussed his care and treatment with his primary doctor in Macedonia and he concurred that CM should rec treatment and the type he was getting and

---

[3] Ceruzzi regularly spoke with Stankovic during his treatment, but she did not give him medical advice. (ECF No. 57-1 at 65; ECF No. 57-12 at 119-20). Nor did she dictate specific treatments to Dr. Giorgio. (ECF 57-12 at 106, 119). At her deposition, she testified, "I would refer and defer to the person that's providing the treatment and make sure that they know what's available, but – you know, what did the document say, and you know, what do we need to do? Where do we need to go? Yea, I mean, I don't do – tell people how to practice. I don't. And I – tell the physician, but I would make sure he knew what was going on." (*Id.* at 119).

> to get it here in the U.S. CM's wife is working on the Carnival Pride - request sent every wk to have CM put on the boarding list. Speak w/ CM usually once a week states he is doing well and he will beat this. CM in good spirits and states he doesn't need anything except to be on the boarding list every Sunday.

(ECF No. 57-11; *see* ECF No. 57-12 at 133).

In October 2006, after Stankovic completed his treatment, he contacted Ceruzzi requesting "financial help to get back on [his] feet[.]" (ECF No. 57-1 at 72). Ceruzzi referred Stankovic to Salvatore Faso, a Carnival in-house attorney and its Director of Maritime Claims at the time, to discuss a potential monetary settlement. (*Id.* at 71, 72, 98-99). Faso then spoke with his superior at Carnival, J. Robert Kirk (another in-house attorney), about Stankovic's situation. (ECF No. 57-13). Faso told Kirk over email:

> My concern relates to the May 2005 sign off in Macedonia with regard to the treatment, or lack of treatment, for the cyst in the right testicle. If Stankovic were to retain counsel, the treatment in Macedonia would be scrutinized with reference to whether the lymphoma should have been detected much earlier.[4]

(ECF No. 57-14).

Carnival eventually agreed to pay Stankovic $35,000 in exchange for executing a seaman's "red letter" release ("Release"), which released Carnival from any and all claims Stankovic might have had against it. (ECF No. 57-1 at 102; ECF No. 57-15). The Release states, *inter alia*:

> I RELEASE (handwritten by Stankovic)[5] [Carnival] from each and every right and claim which I now have or may hereafter have because of any matter or thing which happened before the signing of this paper, it being my attention [sic] by the signing of this paper to wipe the slate clean as between myself and the parties released and their vessels, even as to injuries, illnesses, rights and claims not mentioned herein or not known to me.
>
> \* \* \*
>
> In order to show that your [sic] realize what you are doing please copy in your own handwriting, [i]n the space immediately following, the

---

[4] Faso explained at his deposition that "[t]his email is a summary of what I was thinking about the case and how we were going to resolve the case with Mr. Stankovic. There is no mention in here of anyone questioning the lymphoma diagnosis. So, as far as I'm concerned, there is no question of that that I was aware of at the time." (ECF No. 57-13 at 29).

[5] A seaman's "red-letter" release includes blank spaces for the crewmember to handwrite text to show that he is aware of what he is doing. (ECF No. 15 at 1).

5

statement number (3) which is printed in red ink on the bottom of page 1.

> I KNOW THAT DOCTORS AND OTHER PERSONS MAKE MISTAKES, AND I AM TAKING THE RISK THAT WHAT THEY TOLD ME IS WRONG. IF THAT SOULD [sic] BE THE CASE, IT IS MY LOSS, AND I CANNOT [BACK] OUT OF THE SETTLEMENT.[6]

(ECF 57-15 ¶ J).

Stankovic testified that he understood everything that Carnival's employees told him during execution of his Release and that he did not have any questions. (ECF No. 57-16 at 21).

Years later, in July 2012, Stankovic worked as a sommelier at a restaurant in Miami. (ECF No. 57-1 at 80). He claims that one night, an unknown man approached him in the restaurant and "he told me I have something for you to see, somebody who worked for Carnival Cruise Line wants you to have this. They feel bad for what happened to you and that you should hire a lawyer." (*Id.* at 82). The man gave him an envelope containing the South Miami Hospital/University of Miami pathology reports. (*Id.* at 83). Soon thereafter, Stankovic hired a lawyer. (ECF No. 73-10 at 86).

On January 4, 2016, Stankovic, through counsel, sent Carnival a demand letter. (ECF No. 1-2). In it, he alleges that Carnival employees conspired with Dr. Giorgio to hide from him a misdiagnosis of his testicular cancer. (*Id.*; ECF No. 57-17 ¶ 8). He threatened to sue Carnival if it was "not interested in amicable resolution" of his claim. (ECF No. 57-18 at 3). Carnival responded by filing this action, seeking a declaratory judgment that the Release is valid and binding. (ECF No. 1). Stankovic then filed counterclaims for: (1) fraud in the inducement; (2) fraud and misrepresentation; and (3) civil conspiracy. (ECF No. 21 ¶¶ 54-76).

### STANDARD OF REVIEW

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Thus, the entry of summary judgment is appropriate "against a

---

[6] Carnival made an audio recording of Stankovic's execution of the Release. (ECF No. 57-16; ECF 57-13 at 14). Stankovic twice read aloud what he wrote on the Release, stating, *inter alia*, that he knew "doctors and other persons make mistakes and I am taking the risk that what they told me is wrong. If that should be the case, it is my loss and I cannot out of the – back out of the settlement." (ECF No. 57-16 at 16, 20).

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.*

Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

"A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon*, 196 F.3d at 1358. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission*, 414 F. App'x 264, 266 (11th Cir. 2011).

## DISCUSSION

Before I address the merits of the parties' respective claims, I first discuss Carnival's arguments that Stankovic's counterclaims are untimely.

### A. Timeliness of the Counterclaims

Carnival's arguments are two-fold: (1) the three-year maritime personal injury statute of limitations, 46 U.S.C. § 30106, bars the counterclaims; and (2) under the equitable doctrine of laches, having to defend against the counterclaims would unfairly prejudice Carnival. Neither argument is persuasive.

Historically, maritime tort jurisdiction depended solely on the locality of the wrong – "[i]f the wrong occurred on navigable waters, the action [was] within [maritime] jurisdiction; if

the wrong occurred on land, it [was] not." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253 (1972). In *Executive Jet*, the Supreme Court retreated from the "purely mechanical application of the locality test," and held that "the wrong [must also] bear a significant relationship to traditional maritime activity" – the nexus test. *Id.* at 261, 268, 93. Thus, I must consider the situs of the events leading to Stankovic's counterclaims (locality test) as well as the relationship between those events and traditional maritime activity (nexus test) to determine whether maritime law applies to the counterclaims.

There is no dispute that the events leading to Stankovic's counterclaims did not occur on navigable waters. The alleged misdiagnosis and "cover up" occurred at various land-based medical facilities, and Stankovic executed the Release on land in Miami, Florida. (ECF No. 1-1 at 4). Moreover, none of the allegations supporting Stankovic's claims – his diagnosis, his treatment, the alleged "cover up," his execution of the Release – bear a significant relationship to traditional maritime activity. The only connection to maritime activity here is that Stankovic was a seaman who signed a contract with a vessel owner. That is enough to confer this Court with jurisdiction under 28 U.S.C. § 1333, but not enough to require application of maritime law. Applying Florida law, the four-year statute of limitations began to run in July 2012 when Stankovic claims he learned of Carnival's alleged deception. *See* Fla. Stat. § 95.11(3)(j). His counterclaims, filed on January 29, 2016, were therefore timely.

Carnival's laches argument is similarly unpersuasive. In *Van Meter v. Kelsey*, 91 So.2d 327, 330-31 (Fla.1956), the Florida Supreme Court set forth the necessary elements to establish the affirmative defense of laches: (1) "there must be conduct on the part of the defendant, or on the part of one under whom he claims, giving rise to the situation of which complaint is made"; (2) "the plaintiff, having had knowledge or notice of the defendants' conduct, and having been afforded the opportunity to institute suit, is guilty of not asserting his rights by suit"; (3) "lack of knowledge on the part of the defendant that plaintiff will assert the right on which he bases his suit"; and (4) "injury or prejudice to the defendant in event relief is accorded to the plaintiff, or in event the suit is held not to be barred."

Carnival bases its assertion of prejudice on the fact that its witnesses are no longer employed with the company, do not have an independent recollection of the events underlying Stankovic's counterclaims, and would have to refresh their recollections by reviewing documentary evidence. (ECF No. 57 at 25). That does not constitute sufficient prejudice to justify application of the laches doctrine under the facts of this case. The fact that Stankovic

brought his counterclaims nearly ten years after the events underlying his counterclaims does not demonstrate a lack of diligence on his part. Rather, the lengthy passage of time resulted from Carnival's alleged concealment. *See Coffey v. Braddy*, 834 F.3d 1184, 1190 (11th Cir. 2016) ("[A] defendant may not be able to base a defense on laches if the defendant contributed substantially to the delay in the filing of the suit or if the delay results from the defendant's concealing or misrepresenting facts."). Carnival's laches argument is therefore also unavailing.

I next address the merits of the parties' Motions.

### B. Merits of the Parties' Claims

Carnival asserts that Stankovic was aware of the South Miami Hospital/University of Miami pathology reports before he signed the Release, and seeks dismissal with prejudice of Stankovic's counterclaims and a declaratory judgment that the Release is valid and binding. Stankovic seeks to circumvent the Release, claiming that he was fraudulently induced to execute it because no one, including Dr. Giorgio, had previously told him about the reports.

While "[a] contract procured through fraud is never binding upon an innocent party thereto," *Buchanan v. Clinton*, 293 So.2d 120, 122 (Fla. Ct. App. 1974) (citation omitted), a court never presumes fraud – the party asserting fraud has the burden of proving it. *Florida East Coast Ry. Co. v. Thompson*, 93 Fla. 30, 35 (1927). "The burden resting upon the releasor to escape the legal effect of a formal, written release, such as the one here involved, is a heavy one." *Id.* A court will not assume fraud based "upon doubtful or vague parol evidence, especially where there is substantial credible evidence to the contrary." *Id.*

As a threshold matter, Stankovic admitted that he "had many discussions with Dr. Giorgio about my situation," and believed he had a good working relationship with the doctor. (ECF No. 57-1 at 30). Stankovic and Dr. Giorgio arranged for checkups before each chemotherapy session. (*Id.* at 34-35). At those meetings, Stankovic and Dr. Giorgio discussed his treatment and test results. (*Id.* at 36). Indeed, Stankovic conceded that Dr. Giorgio regularly updated him on his treatment. (*Id.* at 37).

But at the same time, Stankovic testified he does not remember specifics of what Dr. Giorgio told him regarding his treatment. (*Id.* at 37). For example, Stankovic stated, "I vaguely remember sometimes he would tell me the white blood cells are low or high, that we need to do something else, or we need to administer some more medications. I really don't remember the tests." (*Id.* at 36). Stankovic also could not remember whether Dr. Giorgio ever showed him any biopsy reports or positive pathology reports. (*Id.* at 38). Stankovic's testimony

9

therefore suggests that he may not remember whether Dr. Giorgio discussed the South Miami Hospital/University of Miami pathology reports with him. That said, when asked directly whether it is possible that he simply does not recall discussing those reports, he responded, "I have absolutely not discussed those reports." (ECF No. 10 at 60).[7]

In the Eleventh Circuit, as a "general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013); *see Reid v. Sec., Fla. Dept. of Corr.*, 486 F. App'x 848, 852 (11th Cir. 2012) ("[F]or purposes of summary judgment, there is nothing inherently wrong with 'self-serving testimony,' and it may not be disregarded by the district court in determining whether there is a genuine dispute of fact on a material issue in the case."); *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."). None of those exceptions to the general principle apply here. I therefore cannot disregard Stankovic's testimony.

Accordingly, because there is conflicting testimony as to whether Stankovic learned about the South Miami Hospital/University of Miami pathology reports before signing the Release, summary judgment is inappropriate. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

I offer no opinion as to whether Dr. Giorgio actually misdiagnosed Stankovic. Nor do I offer an opinion as to whether Dr. Giorgio and Carnival conspired to hide the alleged misdiagnosis. Whether there was a misdiagnosis, and whether there was a fraudulent

---

[7] Stankovic made similar statements in other portions of his testimony. (ECF No. 10 at 33, 38, 39, 46, 47, 68, 69).

conspiracy to induce Stankovic to execute the Release, are questions of fact for the jury.[8]

## CONCLUSION

It is, therefore, **ORDERED** and **ADJUDGED** that Carnival's Motion for Summary Judgment (ECF No. 57) is **DENIED**, and Stankovic's Motion for Summary Judgment (ECF No. 73) is **DENIED**.

**DONE** and **ORDERED** in chambers at Miami, Florida, this 7th day of April 2017.

*Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of Record*

---

[8] Absent fraud, it appears the Release bars any claims Stankovic might have against Carnival. I decline, however, to make a final ruling on that issue at this time.